## 29558. CODE v. THE STATE.

INGRAM, Justice.

The defendant, Willie Code, Jr., appeals from his conviction and sentences in the Superior Court of Bibb County on two counts of murder and one count of armed robbery. He received two life sentences on the murder counts and a 10-year sentence for the armed robbery, all to be served concurrently. We affirm the judgment of the trial court.

I.

Motion to Suppress.

Prior to trial, defense counsel moved to suppress certain evidence seized during a search of defendant's residence and to suppress incriminating statements made by the defendant while in custody. At the pre-trial hearing on the motion to suppress, the trial judge also considered whether a witness' identification of defendant at defendant's residence and at a subsequent lineup would be admissible at the trial and whether that witness would otherwise be allowed to identify defendant at the trial. The trial judge sustained defendant's motion to the "show-up" identification of defendant at defendant's residence and to the lineup as impermissibly suggestive in nature, but reserved ruling on the question of whether the witness could otherwise make an in-court identification of defendant at the trial. The trial judge

overruled defendant's motion to the search, and resultant evidence seized, by the state at defendant's residence and to the admissibility of two incriminating statements by defendant. Finally, at the trial, the defense objection to the in-court identification of defendant by the witness, Randy Hornaday, was overruled.

## II.
### Statement of the Case.

The evidence reveals that on the evening of March 27, 1973, Melvin Durden and Clyde Miles, both employees of the Tiger Package Store in Macon, were killed by shotgun blasts. The circumstances at the scene indicated that a robbery had taken place.

Mr. Charles Lee arrived at the Tiger Package Store at approximately 9:45 p.m. in anticipation of seeing Mr. Durden concerning a business matter. Mr. Lee testified that as he approached the store he noticed a Volkswagen leaving the store. Upon entering the store, Mr. Lee discovered the body of Mr. Miles and the cash register drawer ajar. He telephoned the police, and upon arrival they found the body of Mr. Durden outside the back of the store.

A witness, Randy Hornaday, testified that he and a friend were sitting under a bridge on Pio Nono Avenue, the street on which the Tiger Package Store was located, and at about 10 p.m. noticed a green Volkswagen with high back seats and spoke wheels stop under the bridge. The witness further testified that a colored man, got out of the car and put some liquor bottles and a rifle or shotgun into the trunk of the car. The witness stated that he then left and went to a friend's house in the neighborhood where he heard news of the shooting. He then went to the package store and told the police officers there what he had observed, giving a general description of the colored man he had seen earlier under the bridge.

The police broadcasted this information over their radio. Later that evening, the police received an anonymous telephone call informing them the caller knew a person fitting the description of the person mentioned in the broadcast. The caller named Willie Code. The police compared a description of Willie Code they had in their files with the description given by the

witness, Randy Hornaday. Upon discovering the similarity in the descriptions, several police officers visited the Code residence. Upon arrival at the house, the police found a green Volkswagen matching the description of the vehicle given them by the witness Hornaday. A detective who knew the Code family knocked on the door and was admitted by defendant. Several of the officers with him also entered the house and the detective informed defendant and his father, with whom the defendant lived, of the nature of their inquiry and then asked defendant and his father if they (police) could search the house. The detective told both defendant and his father that the police would leave and obtain a search warrant if they desired, but both defendant and his father advised the detective that a warrant would not be necessary and that the police could search the house at that time. A police officer was dispatched to obtain a consent form which was signed by defendant when the officer returned. Defendant was advised of his Miranda rights while the officers were in the house conducting this search.

As the result of the search, a shotgun which apparently had been recently fired, several liquor bottles and $25 in cash were seized by the officers. While the police were conducting this investigation at defendant's residence, the witness, Randy Hornaday, was brought to the scene and he identified the car in defendant's driveway. In addition, upon seeing defendant the witness identified defendant as the man he had seen under the bridge. The defendant was then taken to city hall for further interrogation. A short time after his arrival at city hall, defendant was placed in a lineup and was identified again by the witness Hornaday as the man he saw under the bridge. During the course of his interrogation by the officers, the defendant was informed of certain evidence known to the officers which refuted a claim of alibi made by defendant to the officers. Defendant was also informed that liquor bottles found at his residence appeared to be very similar to liquor bottles taken in the robbery. Defendant then gave a statement to the officers in which he admitted the robbery and the shootings and returned to his house with the officers where he showed them the location of the stolen money which had been hidden there.

## III.
## Search and Seizure Issue.

Defendant's first enumeration of error is that the trial court erred in overruling his motion to suppress the evidence seized by the state during a search of defendant's residence. Defendant's counsel argues that the consent given by defendant and his father to a search of the house by the officers was invalid under the requirements laid down by the U. S. Supreme Court in Schneckloth v. Bustamonte, 412 U. S. 218 (93 SC 2041, 36 LE2d 854) (1973). The basic holding of Schneckloth is that, in a consent search, the burden is upon the state to "demonstrate that the consent was voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances." Id. p. 248. See *Hicks v. Caldwell*, 231 Ga. 575 (203 SE2d 212) (1974).

Defendant's argument centers around the fact that approximately 11 officers were in and about the house and premises at the time the alleged consent was given, and that the officers had absolutely no basis upon which probable cause could be shown to justify the issuance of a search warrant to them. Nevertheless, it is argued the officers clearly intimated that if they were not given permission to search they would get a search warrant to do it.

A consent which is the product of coercion or deceit on the part of the police is invalid. Bumper v. North Carolina, 391 U. S. 543 (88 SC 1788, 20 LE2d 797) (1967). See also, Anno. 9 ALR 3d 858, § 4 (1966). Thus, close judicial scrutiny of an alleged consent to search is necessary. This is particularly true under the circumstances of this case because it is difficult to imagine why an accused who steadfastly denies his guilt, would voluntarily permit officers to conduct a search of his premises if he knows that incriminating evidence will be found. See, Higgins v. United States, 209 F2d 819 (D. C. Cir. 1954).

At the pre-trial hearing on the motion to suppress, the trial judge found no effort on behalf of the police officers to intimidate either the defendant or his father and also found that the police advised them they would like to search the house but could not do so without a

warrant or their consent. The evidence at the pre-trial hearing shows that defendant, a high school graduate, signed a consent form stating that he had been advised of his right not to allow the search, but nevertheless authorized the named officers to search the house and his vehicle. Defendant's father testified that the detective stated to him, "We ain't got no search warrant now, but would it be all right with you if we looked around a little?" Defendant's father stated that he responded, as follows: "I told him, 'yeah, it's all right with me.' I told him to just help his self [sic], it's all right with me." Mr. Code, the father, then responded in answer to the question of whether he gave the officers permission to look around in the house, "Yeah, 'cause I didn't know anything was in the house."

We believe the evidence supports the trial court's finding that defendant and his father voluntarily gave permission for the officers to search the house. Although the house was surrounded by police, this does not ipso facto require a finding of coercion. Defendant's father also testified the officers who came to the door were courteous and in no way abusive. He stated that the police "were acting nice and everything . . . didn't none of them in no way act rascally, in no way talk big, or nothing like that." He further stated in regard to the treatment of his son by the officers that, "as far as I know, they were very nice to him. They didn't dog at him, fuss at him or nothing like that, that I know of. Course, I couldn't see exactly into his room where they all were, but I don't know of any ill treatment that went on at all." Admittedly, where the presence of many policemen is known to a defendant, his alleged consent to search should be carefully evaluated for coercion. In this case, it is not difficult to understand why several officers made the visit to defendant's home when you consider the nature of the information they had at the time. They knew that two men had been killed with a shotgun in a robbery; that they might well encounter a suspect fitting defendant's general description; and, upon arrival, the officers found a car in defendant's driveway fitting the exact description of the automobile seen earlier near the scene of the robbery under highly suspicious circumstances. We must look to the conduct of the officers

at defendant's residence to ascertain whether there was coercion in obtaining the consent to search.

The evidence shows that the officers made no threats of any kind either to defendant or to his father. For this reason, the present case is distinguishable from *Kelly v. State,* 129 Ga. App. 131 (198 SE2d 910) (1973), relied upon by defendant, where an officer stopped that defendant's car and, with guns drawn, asked for the key to the trunk. Those officers did not request a consent to search, nor did they indicate that the defendant might refuse.[1]

Defendant also argues that the detective stated that if no consent to search were given, he would obtain a search warrant and that this necessarily invalidated the defendant's consent as being under duress. It is true that where deceit is used to obtain a consent, e.g., when an officer represents to an accused that he has authority to search, when actually he does not, a resultant consent by the accused to the search is invalid. In these circumstances, the consent is merely a submission to an apparent legitimate display of legal authority to which all are required to submit. See Bumper v. North Carolina, supra. The facts in the present case authorize a contrary conclusion.

We believe that these facts show probable cause upon which the police officers could have obtained a search warrant. In addition, under all the circumstances shown in connection with the consent given the officers to search without a warrant, the trial judge was authorized to find that the consent was not the product of coercion, duress or deceit. The facts in *Flournoy v. State,* 131 Ga. App. 171 (205 SE2d 473) (1974), also relied upon by defendant, involving a woman detained by officers on the highway at 1:00 a.m. while other officers apparently went for a search warrant, are distinguishable. The particular facts of each case must be reviewed for a determination of probable

---

[1]The Supreme Court in Schneckloth refused to hold that the police must advise a suspect of his right to refuse consent. The test is merely a question of voluntariness under the totality of the circumstances. 412 U. S. 218, 229-234 (1972).

cause and reasonableness. The controverted facts of *Flournoy* and that 5 to 4 holding of the Court of Appeals are not persuasive here.

## IV.
### Incriminating Statements.

Defendant's next contention is that the incriminating statements made by him, while in custody, resulted from the unlawful search of his residence and therefore are inadmissible. The basis of defendant's argument is the poison fruit doctrine of Wong Sun v. United States, 371 U. S. 471 (1963). This argument is without merit because of our determination that the search was legal and proper since it was conducted pursuant to a voluntary consent.

Defendant also argues that he never waived his right to counsel and the right to remain silent. Therefore, defendant urges that the statements made by him during interrogation without counsel were inadmissible. One of the investigating officers procured a waiver of counsel form prior to a lineup and read it to the defendant. Defendant answered that he could not afford a lawyer, so the officer told him that if he could not afford to hire a lawyer, one would be appointed at no cost to him. Defendant was then asked if he understood this and he stated that he did. Defendant then asked the detective if making bond depended upon his signing the waiver. The detective did not reply directly to this question but did state to defendant that there would be no bond until the investigation was over and that if he were found guilty of the crime of murder there would be no bond. The officer testified that defendant answered, "I'd just rather sign [the waiver]."

The evidence also shows that in addition to signing a waiver of counsel form, defendant was advised of his rights earlier at his home and indicated then that he understood those rights. He was again advised of his rights when taken to the police station at which time he stated that he understood his rights and that he did not need a lawyer. Defendant again was advised of his rights prior to interrogation and at that time he stated that he understood them.

It was after all of these warnings that defendant

signed a waiver of counsel form and stated that he didn't mind talking because they had the wrong man. The evidence shows that defendant was also advised of his rights two more times during the interrogation. In the course of this investigation, defendant mentioned the names of several alibi witnesses to the officers. The officers checked these out and also told defendant they had gathered other evidence which indicated the liquor bottles taken from defendant's residence were the same size and brand as those stolen from the Tiger Package Store. In addition, defendant was told that his witnesses did not substantiate his alibi claim. When the officers asked defendant about the liquor bottles, the defendant merely stated: "I had just as well tell you the truth, y'all got me." Defendant then made an oral statement, unaided by the investigators, which was reduced to writing and signed by him, along with a written statement of his rights which defendant also signed.

Defendant now contends that he never expressly waived his right to counsel or to remain silent. In quoting from Miranda v. Arizona, 384 U. S. 436 (1965), defendant argues that, "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U. S. 478, 490, n. 14 [1963]. . . An express statement that the individual is willing to make a statement and does not want an attorney, followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U. S. 506, 516 . . . (1962) is applicable here: 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' " Id. p. 475.

Clearly, the mere statement by defendant that he

could not afford counsel, as he argues, is insufficient to constitute waiver and a review of the evidence is always necessary under Escobedo, supra, to determine if the state has met its burden of demonstrating that the statement was voluntarily made by the accused. Although the defendant never expressly said, "I want to make a statement and I knowingly and intelligently waive my rights to presence of counsel and against self incrimination," we believe the precautions and warnings shown here were sufficient. Defendant was repeatedly advised of his rights and each time the defendant indicated that he fully understood them. He also signed a waiver of counsel form after it had been fully explained to him. Defendant stated that he did not mind talking to the officers and that he did not need a lawyer. As the trial judge found, the evidence shows that the incriminating statements made by defendant were made freely and voluntarily without hope of benefit or the fear of punishment.

We conclude that the court and jury were authorized to find, from the evidence presented, that the statements made by defendant were made freely and voluntarily without promise or threat and that defendant was fully aware of his constitutional rights at all times.

## V.
### Identification of Defendant.

Defendant also contends the trial court erred in overruling his objections to the testimony of the witness Randy Hornaday who identified defendant as the person he observed near the scene of the crime. At one point during the trial, the prosecution apparently felt that impermissibly suggestive identification procedures may have been used which cast doubt on this witness' independent ability to identify defendant as the man he had seen at the bridge near the scene of the crime. However, later during the trial, the trial judge ruled the witness' in-court identification was admissible. The witness had first testified that he recognized the defendant by virtue of the events subsequent to the night of the crime. However, upon later questioning by the trial judge, the witness stated that he recognized the defendant from the "mental image" he constructed from seeing him

under the bridge the night of the crime, and that he only recognized the defendant later as the same man.

One-man showups and other impermissibly suggestive pre-trial identification procedures have been held to render an in-court identification inadmissible where the subsequent identification was unnecessarily suggestive. Stovall v. Denno, 388 U. S. 293 (87 SC 1967, 18 LE2d 1199) (1967); United States v. Wade, 388 U. S. 218 (87 SC 1926, 18 LE2d 1149) (1967); Gilbert v. California, 388 U. S. 263 (1967); Neil v. Biggers, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972); *Moye v. State,* 122 Ga. App. 14 (176 SE2d 180) (1970); *Davis v. State,* 233 Ga. 847. And, cf. *Puckett v. State,* 233 Ga. 449 (211 SE2d 740). In *Moye,* supra, pp. 17, 18, the Court of Appeals stated that, " a conviction based upon an in-court identification following a pre-trial identification will be set aside on that ground only if the pre-trial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States [390 U. S. 377]. . . Even if the pre-trial identification is 'tainted' the in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an 'independent origin.' [Cits.]"

Upon questioning by the trial judge, the witness stated that his "mental image" was from what he had seen under the bridge near the scene of the crime and not from seeing defendant subsequently at defendant's residence or in the lineup. Asked by counsel for defendant, "Do you really know what you'd do here if the lineup or the showup hadn't happened?" The witness answered, "I'd recognize him if I seen [sic] him." The trial judge questioned the witness thoroughly regarding his identification of defendant and defense counsel examined the witness extensively, finally stating to the court that, "I won't ask any further questions. The witness fairly and completely, I agree, believes that he has independent recollection." Under these circumstances, we hold that the trial judge did not err in overruling defendant's objection to the in-court identification and leaving the question of credibility of the identifying witness to the jury. See *Kendricks v. State,* 231 Ga. 670 (203 SE2d 859) (1974);

and, *Curtis v. State,* 224 Ga. 870, 873 (165 SE2d 150) (1968).

## VI.
### General Grounds.

Defendant's final contention is that the trial court erred in overruling his motion for new trial. In view of our determination regarding the admissibility of the evidence of defendant's incriminating statements, the evidence gathered at defendant's home, and the witness' identification of defendant, the motion for new trial on the general grounds was properly overruled. We find no error for any reason enumerated in this appeal.

*Judgment affirmed. All the Justices concur.*

SUBMITTED JANUARY 13, 1975 — DECIDED APRIL 8, 1975.

*Bennett, Mobley & Dantzler, Deryl D. Dantzler,* for appellant.

*Fred M. Hasty, District Attorney, Walker P. Johnson, Assistant District Attorney, Arthur K. Bolton, Attorney General, Thomas O. Duvall, Jr., Assistant Attorney General,* for appellee.