A03A0669. SMITH v. THE STATE.
A03A0673. CALDWELL v. THE STATE.
(585 SE2d 888)

ANDREWS, Presiding Judge.

Pursuant to the grant of an interlocutory appeal, Patrice Smith and Alfred Eugene Caldwell appeal from the trial court's denial of their motions to suppress. Both Smith and Caldwell were charged with theft by receiving and theft by taking of two computer monitors and two computer keyboards, as well as possession of cocaine and less than an ounce of marijuana. Caldwell also was charged with pos-

---

[3] The third option is precluded by the mandatory language of OCGA § 11-2-607 (3) (a), as acknowledged by the majority.

session of a firearm by a convicted felon and use of a firearm during the commission of a felony.

In considering an appeal from denial of a motion to suppress, this Court construes the evidence in favor of the trial court's ruling, and we review de novo the trial court's application of the law to undisputed facts. *Jones v. State*, 259 Ga. App. 849, 850 (578 SE2d 562) (2003). Absent an abuse of discretion, the trial court's order on a motion to suppress will not be disturbed. *Hatcher v. State*, 219 Ga. App. 82, 84 (464 SE2d 236) (1995).

Smith's grounds for her motion to suppress were that there was no probable cause or reasonable and articulable suspicion for the stop of her car; that she was held without probable cause; that she was not properly and timely given her *Miranda* warnings; and that all evidence regarding the stop, any statements she made after the stop, and any evidence seized should be suppressed as the "fruit of the poisonous tree." Caldwell's grounds were lack of probable cause for his arrest; no exigent circumstances; the searches were illegal and without his consent; and all evidence obtained as a result of the search was "fruit of the poisonous tree."

Viewed in favor of the trial court's ruling, the evidence was that, on December 28, 2000, Gwinnett Police responded to a 911 call from the employees of a computer store. When Officer J. P. Wilbanks arrived, a store employee reported that boxes containing two computer monitors and two keyboards had been stolen from the store's loading dock. The employee returned to the loading dock in time to see a car containing two men pull around the building, with the boxes containing the computer equipment in the back seat. The car was a smaller, white passenger model with license plate number 680 PPY.

Jeff Griffin told Officer Wilbanks that he was driving near the computer store at the time of the incident and noticed a white car leaving the parking lot at a high rate of speed and in a reckless manner. He saw people running up behind the vehicle waving at it. Suspecting something was wrong, he began to follow the car. He noted that the car had the license plate number 680 PPY. Griffin followed the car to a residential area and then returned to the computer store to report what he had seen.

Griffin subsequently rode with Wilbanks along the route he had seen the car take until they located a vehicle matching the witnesses' description. The car was unoccupied and parked in front of the 700 building of an apartment complex. Wilbanks confirmed that the license number on the car was 680 PPY and noted that it was backed up directly in front of Apartment 702. He then drove to the exit area of the apartment complex and called for additional officers to come to the scene. Another officer, Lieutenant Hood from the Norcross Police

Department, arrived a short time later. As the two officers were talking, they saw the white car drive up to the exit area. Wilbanks waved the car down in order to speak with the driver, later identified as Smith. Smith's baby was also in the car.

Wilbanks explained that the car Smith was driving had been seen leaving the scene of a theft and asked what she was doing at the apartment complex. Smith said that she lived in Winder and was at the apartment to visit a friend, but she was leaving because she had been unable to find her friend. She told the officers that she had been close to her car the whole time and had merely parked in front of the 700 building to throw away some trash. When Wilbanks checked the car earlier, however, no one was around it or the nearby dumpster. While they were talking, a third policeman, Gwinnett County Officer Wilkerson arrived. Wilbanks acknowledged that, at this point, Smith was being detained and was not free to leave, although she was not under arrest. At some point during this period, Wilbanks confiscated Smith's cell phone as she attempted to place a call.

Smith later told police that she had actually been visiting a male friend named Cory in Apartment 809, and she agreed to take the officers there. When they arrived at the apartment, Cory and the other occupants of the apartment denied that Smith had been there. When Cory was asked about the computers, he indicated they should look in Apartment 702.

Wilbanks then directed Smith to walk with him to Apartment 702. Wilbanks had Smith stand in front of the apartment door, then stood to one side, out of sight, and knocked on the door. Caldwell opened the door, and Wilbanks observed large quantities of electronic equipment behind him. Wilbanks then leaned into the apartment, without stepping inside, and saw several boxes containing computer equipment that matched the store employee's description.

At that point, Wilbanks reached in and grabbed Caldwell in a wristlock. The officer walked Smith and Caldwell over to the patrol cars. As they were walking, Smith spontaneously stated that she had just purchased the computers that day. Wilbanks handed Caldwell off to Officer Wilkerson, who patted Caldwell down and found a loaded .25 caliber pistol in his waistband. Wilbanks then placed Smith in the back of a patrol car and advised her of her rights. Smith told Wilbanks that the apartment was hers and that her name was on the lease. Wilbanks asked for permission to search the apartment, stating that his other option was to go and seek a search warrant. In response, Smith consented to a search of the apartment. At this point Smith had been detained for approximately one and one-half hours.

Afterward, the officers entered the apartment, where they located Derrick Campbell, a third co-defendant, hiding under a bed. They confirmed that the computer boxes matched those taken from

the store and found two additional guns, a film canister full of crack cocaine, and some marijuana. The officers brought Caldwell back into the apartment and advised him of his rights. He stated that the guns and drugs were his, but that he did not know how the computers had gotten into the apartment. The officers also brought Smith inside the apartment, where she watched the officers itemize and remove each item, but did not withdraw her consent.

1. Smith and Caldwell assert that Wilbanks's initial stop of Smith's car was illegal because he lacked articulable suspicion. We disagree.

A police officer may make a momentary detention and investigation based upon specific and articulable facts, which must exceed mere inclination, caprice, or harassment. *State v. Stansbury*, 234 Ga. App. 281, 283 (505 SE2d 564) (1998); *Bailey v. State*, 202 Ga. App. 427, 428 (414 SE2d 330) (1992). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." (Citation and punctuation omitted.) *Freeland v. State*, 223 Ga. App. 326 (1) (477 SE2d 633) (1996).

The store employee gave a description of the car involved in the crime, including the license tag number. Griffin, who gave an identical description, followed the car to the vicinity where it was later found parked. Wilbanks confirmed that the car in question had the reported license tag number, and the stop was made within an hour after the theft occurred. Under these circumstances, we find that Wilbanks had articulable suspicion to stop the car and detain Smith for further investigation at the scene. See *Brown v. State*, 253 Ga. App. 741, 742 (1) (560 SE2d 316) (2002).

2. Smith and Caldwell also assert that Smith was unlawfully detained without being read her *Miranda* rights.

*Miranda* protections apply when an individual is either (1) formally arrested or (2) restrained to the degree normally associated with a formal arrest. *Ayres v. State*, 259 Ga. App. 290, 292 (1) (576 SE2d 597) (2003). Although Wilbanks testified that Smith was not free to go at the time of the stop, he stated that she was not under formal arrest until she was placed in the patrol car. Therefore, we must determine whether Smith's earlier detention involved the degree of restraint associated with a formal arrest. In doing so, we apply an objective test to determine whether a reasonable person in Smith's place "would feel so restrained as to equate to a formal arrest." (Punctuation and footnote omitted.) Id. "A reasonable person has been defined as one neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circum-

stances." (Citation and punctuation omitted.) *Turner v. State*, 233 Ga. App. 413, 415 (1) (a) (504 SE2d 229) (1998).

While Smith was not free to leave, not every detention equates with an arrest. A "law enforcement officer coming upon the scene of suspected criminal activity will conduct a general on-the-scene investigation and may detain temporarily anyone at the scene. . . . Such detentions do not trigger the requirements of *Miranda v. Arizona.*" (Citation and punctuation omitted.) *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001). The governmental interests supporting the initial seizure of a person include effective crime prevention and detection. *Roberts v. State*, 193 Ga. App. 96, 98 (386 SE2d 921) (1989). In pursuit of these interests,

> [r]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. . . . The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

(Citation and punctuation omitted.) Id. The officers' initial questioning was directed at determining whether Smith had involvement in or knowledge of the theft, and thus was within the limited scope of an initial on-scene investigation. See *Ware v. State*, 198 Ga. App. 24, 26-27 (2) (400 SE2d 384) (1990).

While the officers had taken her cell phone to prevent her from calling, the seizure of her phone was not in and of itself illegal as it served the legitimate purpose of preventing any interference with the investigation.[1] "When the nature and [the] extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure (of person or property) based on less than probable cause. . . ." (Citation and punctuation omitted.) *Roberts v. State*, 193 Ga. App. at 98. Compare *Brown v. State*, 191 Ga. App. 779 (383 SE2d 170) (1989) (where no articulable suspicion for initial stop, seizure of property illegal).

When Smith's phone was seized and she was asked to lead

---

[1] Smith admitted at the motion hearing that she considered calling Caldwell or Campbell and thus may have alerted them to the officers' presence, adversely affecting the investigation.

Wilbanks to the apartment she claimed to have been visiting, Wilbanks's actions went beyond mere investigative inquiry. Although Smith agreed to take Wilbanks to the apartment, the issue is whether a reasonable person would have believed that she was free to refuse the request under the circumstances or whether she felt so restrained by the officer's actions as to equate with formal arrest. In making that determination, we examine all the circumstances. *State v. Wintker*, 223 Ga. App. 65, 66 (476 SE2d 835) (1996).

By that point, there were four police officers present. The officers told Smith that her car had been involved in a crime. While she was allowed to drive it to Apartment 809 with her baby inside, it is apparent that she was not free to drive the car away. Thus, it had been effectively seized by the officers. Moreover, they had seized her cell phone, limiting her access to anyone not present at the scene. While leading the officers to the apartment, Smith was separated from her four-month-old baby. Although she did not specifically request to take the child with her, the weather that day was cold, leaving her with the choice of exposing the child to the weather for an undefined period or leaving the baby in the car.

Under these circumstances, we find that a reasonable person in Smith's place would have believed that her detention was more than just that required for temporary questioning:

> [Smith's] experience falls squarely within a class of cases *Miranda* was particularly concerned with, that is, situations where a suspect is subjected to police interrogation while "cut off from the outside world," because such incommunicado interrogation in a police-dominated atmosphere can result in self-incriminating statements without full warnings of constitutional rights. . . . [Smith's] interrogation was equally isolated and police-dominated; there was a significant "compulsive aspect" to the questioning.

(Citation and punctuation omitted.) *State v. Wintker*, 223 Ga. App. at 69. See also *Reinhardt v. State*, 263 Ga. 113, 114-115 (3) (a) (428 SE2d 333) (1993). Accordingly, the officer's actions triggered Smith's right to the protections of *Miranda* during the course of her interrogation.

Any error in not timely giving Smith her *Miranda* warnings was, however, likely harmless. "The exclusionary rule does not apply to the 'fruits' of a voluntary statement obtained after a violation of *Miranda*'s procedural rules but not a violation of the constitution. *Wilson v. Zant*, 249 Ga. 373, 376-378 (1) (290 SE2d 442) (1982), overruled on other grounds, *Morgan v. State*, 267 Ga. 203, 204-205 (2) (476 SE2d 747) (1996); *Cotton v. State*, 237 Ga. App. 18, 20 (513 SE2d

763) (1999)." *Casey v. State*, 246 Ga. App. 786, 791 (4) (542 SE2d 531) (2000).

Here, Officer Wilbanks testified that Smith's statement that she had purchased the computers that day, which was made after she was formally arrested, was spontaneous and that her consent to search her apartment, #702, was voluntary. Apparently, the trial court made a factual determination that the statement was spontaneous and that the written consent to search form was voluntarily signed by her after she had been given her *Miranda* warnings by Wilbanks. Because the trial court saw and heard Officer Wilbanks and Smith testify regarding when it was signed, before or after the officers had already entered the apartment, that factual determination on credibility is entitled to deference here. See *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

Therefore, there was no abuse of discretion in the trial court's denial of the motions to suppress the information gleaned from the visit to Apartment 809 and the items found in Apartment 702 on the basis of a *Miranda* violation.

3. Smith and Caldwell next assert that the trial court erred in failing to suppress the evidence because Wilbanks violated their Fourth Amendment rights by leaning his body inside the apartment, where he discovered the stolen computer equipment. The State counters that no violation occurred and that the stolen merchandise was in plain view.

Under the plain view doctrine, "the officer collecting the evidence must not have violated the Fourth Amendment in arriving at the place from which he or she sees the evidence. Moreover, the incriminating nature of the object must be immediately apparent." (Punctuation and footnotes omitted.) *Moss v. State*, 275 Ga. 96, 104 (14) (561 SE2d 382) (2002). Wilbanks committed no Fourth Amendment violation by standing outside the apartment and knocking on the door. See *Osment v. State*, 256 Ga. App. 591, 592 (569 SE2d 262) (2002). Caldwell opened the door to admit Smith, with whom he shared the apartment, since Wilbanks had placed himself so he could not be seen before the door was opened. After the door was opened, while Wilbanks could see other electronic equipment behind Caldwell, he could not see the stolen computer merchandise from his position outside the apartment. He had to lean his upper body inside the apartment to see it.

By leaning through the doorway, we find that the officer effected at least a partial entry into the apartment, which was not authorized absent exigent circumstances. See *State v. Sims*, 240 Ga. App. 391, 392 (523 SE2d 619) (1999). The State does not claim exigent circumstances in this case. Accordingly, the officer's actions violated the Fourth Amendment. See *Lewis v. State*, 126 Ga. App. 123, 126 (2) (b)

(190 SE2d 123) (1972); *State v. Olson*, 311 Mont. 270, 275-276 (55 P3d 935) (2002) (evidence that could be seen only when officer leaned into hallway where he was not lawfully entitled to be did not fall under plain view exception to warrant requirement). Compare *State v. Leonard*, 764 S2d 663 (Fla. 1st D. Ct. App. 2000) (evidence that could be seen only when officer stood on his tiptoes or on doorsill was in officer's plain view).

4. The State asserts that the computer evidence was nevertheless admissible as the fruit of a voluntary and valid consent to search by Smith. We agree.

Because Smith's consent was valid, the illegality of any previous warrantless entry into the apartment by the lean is sufficiently attenuated. As held in *Atkins v. State*, 173 Ga. App. 9, 12 (3) (325 SE2d 388) (1984) (authored by now Justice Benham), aff'd, 254 Ga. 641 (331 SE2d 597) (1985):

> While there can be no question that the discovering officer was a trespasser when he initially entered the [doorway] of appellant's residence (see *Bunn v. State*, [153 Ga. App. 270, 272 (2) (265 SE2d 88) (1980)]), his presence was authorized at the time he made the [seizure]. However, even the officer's initially unauthorized presence does not require suppression of the items discovered, because "the consent given . . . is not only a consent to future searches and seizures, but it amounts to a waiver of the warrant requirement with respect to the search previously conducted. . . . Therefore, even if the [lean] into [Smith's apartment] resulted in a warrantless search or seizure, the subsequent voluntary, written consent to search . . . amounted to a waiver of the warrant requirement. . . ." *State v. Williams*, 353 S2d 1299, 1304-5 (La. 1977). See also *State v. Cormier*, 438 S2d 1269 (La. 1983). A voluntary written consent to search having been executed in the case at bar, the prior warrantless entry into the [apartment], if any, was ratified.

In response to the question of why she consented, Smith testified:

> Because I thought that when Officer Wilbanks and Officer Lee came to the car, Officer Wilbanks said that we know everything in the house is stolen, Officer Lee was nodding his head like yes. He had this big old briefcase; I didn't know what he had in it. And I'm thinking that he got something in there that can determine that everything — he know what

everything is supposed to be, you know. And so I'm thinking they done determine something that I didn't know.

Smith later makes reference to the size of the briefcase and that she thought it had "something in it that could sit there and say that everything in my house was stolen." This testimony strains credulity and the trial court's resolution of credibility issues in favor of Wilbanks was not an abuse of discretion. *Vansant v. State*, 264 Ga. at 320 (1).

Because the apartment was in Smith's name, her consent also allows in the evidence as to Caldwell. See *Atkins v. State*, 254 Ga. at 642; *Pledger v. State*, 257 Ga. App. 794, 795 (572 SE2d 348) (2002).

*Darby v. State*, 216 Ga. App. 781, 783 (2) (455 SE2d 850) (1995), relied on by the dissent, is factually distinguishable from the present situation and not applicable. There, the officer, when requesting consent, told the defendant that "a search warrant *would* be obtained" if permission to search were not granted. Here, Officer Wilbanks told Smith, following the giving of her *Miranda* rights, that "my two options in this situation were to go *seek* a search warrant or ask for her consent, and therefore I was asking for her consent before I went to the stage of *seeking* a search warrant." (Emphasis supplied.)

Further, the written consent to search form here advised Smith that she "ha[d] the right to refuse to permit us to enter and search your premises"; that anything found if she did consent could be used against her; and that "[p]rior to permitting us to search, you have the right to require us to have a search warrant."

As stated in *Palmer v. State*, 257 Ga. App. 650, 653 (2) (572 SE2d 27) (2002),

> [a] consent which is the product of coercion or deceit on the part of the police is invalid. *Bumper v. North Carolina*, 391 U. S. 543 (88 SC 1788, 20 LE2d 797) (1968). *"(W)hen an officer represents to an accused that he has authority to search, when actually he does not,* a resultant consent by the accused to the search is invalid. In these circumstances, the consent is merely a submission to an apparent legitimate display of legal authority to which all are required to submit." *Code v. State*, 234 Ga. 90, 95 (III) (214 SE2d 873) (1975). Accord *Darby v. State*, [supra]. "We must look to the conduct of the officers . . . to ascertain whether there was coercion [or deceit] in the consent to search." *Code v. State*, 234 Ga. at 94-95 (III). Whether the consent was coerced is a question of fact to be determined based upon the

totality of circumstances. Id.; *State v. Hall*, 229 Ga. App. 194, 195 (493 SE2d 718) (1997).

(Emphasis supplied.)

Wilbanks did not coerce or deceive Smith. He merely advised Smith that if she did not consent, he would *seek* a warrant, as did the officer in *Palmer*. Compare *Pledger v. State*, supra at 797-798 (consent by one not shown to have authority to consent not attenuated by later oral consent of homeowner).

Also applicable to the present situation is *Brown v. State*, 261 Ga. App. 351 (582 SE2d 516) (2003) (authored by Judge Adams). There, at 8:30 a.m., officers received information from an unidentified informant that Brown had drugs at his home. Later that morning, officers conducted a "knock-and-talk investigation" at Brown's trailer. When Agent Wilcox asked a man sitting outside where Brown was, he stated he was inside. Wilcox then knocked on the door which was opened by Pullen. Asked where Brown was, Pullen said Brown was in the bathroom. Wilcox yelled toward the bathroom, but Brown did not hear him. Then, Wilcox stepped into the trailer, walked to the bathroom door, knocked, and, when Brown responded, told Brown he wanted to see him outside. Id. at 352. At this point, Wilcox stepped back outside the trailer. Brown then called out that he was in the kitchen and Wilcox went in and told him about the information received. Brown acknowledged that he messed with marijuana, but denied hard drugs. Brown then signed a consent to search form and large amounts of marijuana and some cocaine were found.

This Court found that there was insufficient evidence that Pullen had authority to consent to entry by Wilcox. Nonetheless, this Court also concluded that the initial illegal entry by Wilcox did not taint Brown's later consent to search. The factual situation in Smith's case is even stronger, because her consent was in writing.

Further, even disregarding the lean in and actual sighting of the computer equipment, at the time Wilbanks grabbed Caldwell and pulled him out of the apartment, there was sufficient probable cause for both his arrest and that of Smith. The small white car bearing Georgia license plate number 680 PPY was seen pulling away from the computer store with the boxes of equipment in the back seat. Griffin then followed that car to a residential area and then led Wilbanks to the Ambers Apartment complex. There, the car was found backed up directly in front of Apartment 702, but the computer equipment was no longer in the car. Wilbanks looked around the area, observed the dumpster, but saw no one else. While Wilbanks was waiting at the apartments' entrance to prevent the white car's leaving, Smith drove up in the car recently used for a theft. She then told the officers she was from Winder and had not been able to find

the friend she wished to visit. Additionally, she said she had not been out of close proximity to her car and only parked in front of Building 700 to dispose of trash.

After Wilbanks briefly left her with another officer and had returned from taking Griffin back to the computer store, Smith said she had been visiting Cory and agreed to take officers to that apartment. Cory was located, but he said Smith had not been there. Asked about the computers, Cory indicated they should look in Apartment 702.

After Smith was walked back to Apartment 702 and placed in front of the door, Wilbanks knocked on the door, which was voluntarily opened by Caldwell. Wilbanks, from outside the apartment, observed an inordinate quantity of electronic equipment. At this point, there was sufficient probable cause to arrest both Smith and Caldwell. See *Margerum v. State*, 260 Ga. App. 398 (579 SE2d 825) (2003); *State v. Hoover*, 253 Ga. App. 98, 99-100 (2) (558 SE2d 71) (2001).

That being the case, the computer equipment would have been inevitably discovered by the police, either in securing the apartment and the people in it or pursuant to a search warrant. The evidence, therefore, would not be suppressed as "fruit of the poisonous tree." *State v. Rocco*, 255 Ga. App. 565, 566 (566 SE2d 365) (2002), citing *Taylor v. State*, 274 Ga. 269, 274 (3) (553 SE2d 598) (2001).

The evidence found in Apartment 702 was admissible against both Smith and Caldwell, and the trial court did not err in so concluding.

*Judgments affirmed. Johnson, P. J., Blackburn, P. J., Eldridge and Mikell, JJ., concur. Barnes and Adams, JJ., concur in part and dissent in part.*

ADAMS, Judge, concurring in part and dissenting in part.

I concur in Divisions 1 and 3, and concur in that portion of Division 2 that finds that the initial questioning of Smith was within the limited scope of an initial on-scene investigation and that the officer's actions violated *Miranda*. I must respectfully dissent, however, as to the remainder of Division 2 because I do not believe the error was harmless under the circumstances. I further dissent to Division 4 because I do not believe that the state proved that Smith's consent was voluntary.

Although the majority correctly notes that Smith was entitled to a *Miranda* warning at the time the officers extended their interrogation into a visit to apartment 809, the issue does not turn on a simple *Miranda* violation. At that point, the majority concedes the interrogation had gone beyond mere investigation into a detention that equated with a formal arrest, entitling Smith to *Miranda* protection.

I believe Smith's detention at that point was illegal because it went beyond the scope of a second-tier stop under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). "[A] second-tier stop is subject to strict boundaries regarding duration, intent, and scope. Such investigative stop should be brief, limited in time to that minimally necessary to investigate the allegation invoking suspicion." (Punctuation and footnotes omitted.) *State v. Harris*, 261 Ga. App. 119, 122 (581 SE2d 736) (2003).

Here, the interrogation progressed into a third-tier stop, or arrest, which requires probable cause. *State v. Kaylor*, 234 Ga. App. 495, 496 (507 SE2d 233) (1998). And I do not believe the police had sufficient probable cause at that time to arrest Smith. She was driving a car which had been identified as being involved in a crime one hour previously, which gave the officers articulable suspicion to stop the car and conduct a brief investigative inquiry. But both eyewitnesses identified the perpetrators as two males, and no computer equipment was found in the car. Without more, I do not believe that the police had probable cause to arrest Smith at that point and her continued detention was illegal.

The circumstances of *Wilson v. Zant*, 249 Ga. 373, 376-378 (1) (290 SE2d 442) (1982), and the later cases cited by the majority, are distinguishable because in those cases, the defendant was legally in police custody at the time of the *Miranda* violation. See *Cotton v. State*, 237 Ga. App. 18, 20 (513 SE2d 763) (1999); *Casey v. State*, 246 Ga. App. 786, 791 (4) (542 SE2d 531) (2000). And while a *Miranda* violation standing alone may not be enough to suppress the evidence, the violation in this case occurred while Smith was being illegally detained. The illegal detention was a violation of Smith's constitutional rights, which was sufficient to support the suppression of the information obtained at apartment 809. See *Wong Sun v. United States*, 371 U. S. 471, 484-485 (83 SC 407, 9 LE2d 441) (1963) (exclusionary rule bars from trial verbal statements and physical evidence obtained following illegal home invasion and arrest); *Brown v. State*, 191 Ga. App. 779 (383 SE2d 170) (1989) (evidence obtained as a result of illegal detention and unlawful seizure of property should have been suppressed); *Robinson v. State*, 166 Ga. App. 741 (305 SE2d 381) (1983) (confession obtained as a result of illegal arrest not admissible). Thus, I believe that it was clear error for the trial court to deny Smith's motion to suppress the information gleaned as a result of the visit to apartment 809.

And the information derived from the officers' visit to apartment 809 led them to apartment 702, where I agree that Officer J. P. Wilbanks illegally entered the apartment by leaning inside the door-

way.[2] The majority holds that the evidence found in apartment 702 was nevertheless admissible as a result of Smith's later consent, which the majority contends ratified the prior warrantless search of the apartment. See *Atkins v. State*, 173 Ga. App. 9, 12 (3) (325 SE2d 388) (1984).

"When seeking to justify a warrantless search, the State carries the burden of showing that the consent was freely and voluntarily given." (Citations and punctuation omitted.) *State v. Fulghum*, 261 Ga. App. 594, 595 (2) (583 SE2d 278) (2003). Wilbanks testified that when he obtained Smith's consent to search the apartment, he told her that he had two options, either to seek a search warrant or to obtain her consent. And that if she did not consent, he could obtain a warrant based upon the information he had at that point. On cross-examination, Wilbanks was asked:

> And I want to be clear on one thing you said earlier. You told her — you *Mirandized* her and you told her that she could consent to search and you told her, I believe, your testimony earlier was, that she could consent and if she didn't that was fine, you could just go ahead and get a warrant because you knew — I believe your statement was you were beyond probable cause at that point for a warrant?

And Wilbanks replied, "That's substantially what I stated, yes." Smith's testimony is in agreement with Wilbanks. She said he told her, "You might as well, you either sign a consent form or we can go get a search warrant and get it searched."[3]

"When an officer represents to an accused that a warrant to search will be obtained if consent is refused, and does not have probable cause to secure the warrant, then the accused's consent is invalid." (Citation omitted.) *Darby v. State*, 216 Ga. App. 781, 783 (2) (455 SE2d 850) (1995). If the illegally obtained evidence is excluded, the record shows that Wilbanks did not have sufficient probable cause to obtain a warrant. Prior to leaning into the apartment, Wilbanks had no evidence of any stolen merchandise in the apartment and there was nothing to connect either the car or Smith directly to apartment

---

[2] I also believe that the method of Wilbanks' approach to apartment 702 must be considered in analyzing the issues in this case. Wilbanks insisted that Smith accompany him there and then went to the effort to hide his presence, in effect, using Smith as a decoy to get Caldwell to open the door.

[3] I take issue with the majority's characterization of Smith's testimony as "straining credulity." She testified that she was apprehensive because she believed the police had superior knowledge of the situation. In any event, there is no issue of credibility as to what Wilbanks told her in order to obtain her consent. Both witnesses agree that he told her that either she could consent to a search or he would get a warrant.

702 because Smith had not yet admitted that she lived there. And there is no evidence as to the information he actually obtained at apartment 809, other than a direction to apartment 702, or as to whether the information came from a competent or reliable source for that information. "Where the State seeks to establish probable cause through information provided by an unidentified informant, the informant's veracity and basis of knowledge are 'major considerations in the probable cause analysis.'" (Footnote omitted.) *Lyons v. State*, 258 Ga. App. 9, 11 (1) (572 SE2d 632) (2002). All the state provided was a name, Cory, for someone in apartment 809, who may or may not have lived there, and that he directed police to apartment 702. At best, this information shows that Cory knew where Smith and Caldwell lived, but it does not show that he had knowledge to connect them to any criminal activity. Therefore, that information was insufficient to establish probable cause. Id. And although the car was parked directly in front of apartment 702, that information alone would not justify a search warrant. The 700 building contained a number of apartments. When considered as a whole, the information on the record does not provide sufficient probable cause for a search warrant. See, e.g., id. at 9. And without such probable cause, the information was also insufficient to justify the arrest of Smith and Caldwell.

If consent is given following an illegal detention, the state must prove that the consent was not a product of that illegality. *Pledger v. State*, 257 Ga. App. 794, 797 (572 SE2d 348) (2002). It must be determined, therefore, whether the consent is the product of "free will" or was obtained "by exploitation of [the prior] illegality" and that determination depends upon the facts of each case. (Citations and punctuation omitted.) Id.

To determine the voluntariness of a consent to search, courts must look to the totality of the circumstances,

> including such factors as the age of the accused, the length of detention, whether the accused was advised of his constitutional rights, and the psychological impact of all these factors on the accused. In determining voluntariness, no single factor is controlling. A consent to search must be the product of an essentially free and unrestrained choice by its maker.

*State v. Gerace*, 210 Ga. App. 874, 875 (2) (437 SE2d 862) (1993).

Under the totality of the circumstances presented in this case, I would conclude that Smith's consent was not voluntary. I note that the state presented no testimony as to Smith's age or education. But at the point she gave her consent, she had been detained by four police officers for one and one-half hours, without access to the

outside world. Her cell phone, her car, and her four-month-old baby had been effectively seized by police. She had been escorted by officers through the complex to two separate apartments. There is evidence that at the first apartment, she observed officers handcuff the occupants. At the second apartment, she had been used as a decoy to lure Caldwell into opening the door. At that point, the officer illegally entered the apartment by leaning inside and then immediately seized both Caldwell and her by the wrists and walked them to a police car where they were handcuffed and placed in the back seat.

The officer's illegally obtained knowledge of the stolen equipment and the tip to investigate apartment 702 cannot be separated from Smith's later consent. That knowledge led Wilbanks to physically grab Smith and Caldwell and to place them under arrest. And it provided the primary legal basis for Wilbanks's representation that he could obtain a warrant.

Accordingly, I would find that Smith's consent to search resulted from the officers' exploitation of illegally obtained information and an illegal entry into the apartment, and that the evidence obtained following the consent should have been suppressed. See *Bolton v. State*, 258 Ga. App. 217, 218-219 (573 SE2d 479) (2002); *Pledger v. State*, 257 Ga. App. at 797, 800.

The facts of this case are readily distinguishable from *Brown v. State*, 261 Ga. App. 351 (582 SE2d 516) (2003), upon which the majority relies. There, police were conducting a "knock-and-talk" investigation and asked someone outside the defendant's mobile home where the defendant was. The individual indicated that the defendant was inside. The officer then knocked on the door, where someone else said the defendant was in the bathroom. The officer called out, then went into the home and knocked on the bathroom door asking the defendant to come outside. The officer then left the mobile home. He returned when he was called back inside. The defendant later consented to a search of his premises and escorted officers to locations in the woods where he had stored drugs.

Although the officer in *Brown* first entered the home illegally, he obtained no evidence as a result of that illegal entry, and the consent was obtained shortly after the initial contact with police. Any evidence was obtained only after the defendant consented to a search of his property. But most importantly, that case has none of the earmarks of the totally police-dominated situation present in this case, where Smith was completely in police control for one and one-half hours and bodily led from location to location to assist the police in obtaining evidence to use against her.

I am authorized to state that Judge Barnes joins in this opinion.

DECIDED JULY 16, 2003 —
RECONSIDERATION DENIED JULY 31, 2003 — 

*Angela D. Duncan*, for appellant (case no. A03A0669).
*Tyrone M. Hodnett II*, for appellant (case no. A03A0673).
*Daniel J. Porter, District Attorney, Julie L. Johnson, Assistant District Attorney*, for appellee.