A02A1157. PLEDGER v. THE STATE.
(572 SE2d 348)

ELLINGTON, Judge.

Following a bench trial, a Floyd County Superior Court judge found Patches Pledger guilty of two counts of possession of marijuana with the intent to distribute, OCGA § 16-13-30, and possession of a firearm during the commission of a crime, OCGA § 16-11-106. Pledger appeals from the order denying her motion for new trial, contending the judge should have suppressed evidence seized from her

home pursuant to a consent search. Because the search was tainted by an illegal entry into Pledger's home and an illegal seizure of her person, we reverse.

> On appeal from a motion to suppress, the evidence is viewed in a light most favorable to upholding the trial court's judgment. The credibility of witnesses and the weight accorded their testimony rest with the trier of fact. Thus, the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous. Where the evidence is uncontroverted and there is no issue as to witness credibility, however, we review de novo the trial court's application of the law to the undisputed facts.

(Punctuation and footnotes omitted.) *Sanders v. State*, 247 Ga. App. 170-171 (543 SE2d 452) (2000). Viewed in this light, the record reveals the following undisputed facts: Near midnight on September 13, 2000, police officers with the Rome-Floyd Metro Drug Task Force received a tip that Pledger had marijuana in her home. Because the officers considered the informant unreliable, they did not attempt to get a search warrant. Instead, they decided to go to Pledger's home for a "knock-and-talk,"[1] an investigative technique the officers admittedly hoped would result in a consent search of the premises. Five officers participated in this "knock-and-talk" operation; four went to the house and one remained at the precinct.

Pledger's home is a small row house. The back door, which opens into the kitchen, is about 15 feet from the main living area. The home, which had no electricity, was illuminated by a single lamp connected by an extension cord to a neighbor's electrical outlet. When the officers arrived after midnight, Pledger was not home. The officers were in plain clothes, but their badges were visible. A young man answered the door. The officers testified the man appeared to be between 17 and 21 years old. However, the record shows that no officer checked the man's identification or made any effort to determine if he, or the other young man with him, was an adult. Further, the officers did not determine whether the two men lived in the home or were related to Pledger. Although the officers believed the man

---

[1] The lead investigator explained:

[W]e knock on the door, talk to the person, ask them for consent, you know, let them know that we've — we've got a complaint; would you mind if we come in and look, and we get them to sign off on that. We go in and just basically check. . . . You — you knock on the door. You smell marijuana. Well, there — there's your probable cause. I mean they either allow you to go ahead and search the residence or you seize the house, secure everyone there, and obtain a search warrant, and come back in and search the residence with a court order.

who answered the door was "sort of in charge" of the residence, they did not ask him for permission to search because they knew Pledger "was the occupant of the residence." The officers asked to enter and await Pledger's return. The man complied. Three officers went inside; a fourth remained outside in the patrol car.

Two of the officers testified that when they entered the home, they detected the odor of burnt marijuana; however, the officers saw no smoke, could not detect the origin of the odor, and were not even sure that the odor was from marijuana smoked that night. Nevertheless, based on the odor of marijuana, the officers decided to get a warrant to search the home and, in the meantime, "secured the residence." The officers waited about 45 minutes for Pledger to return. While they waited, the officers handcuffed the men and detained them both in the living room. An officer testified that the two men were not free to leave.

When Pledger returned home through her back door, she was met by a police officer standing in her kitchen. Pledger's guests were in handcuffs in the living room, accompanied by a second officer. A third officer was in a back room, just off the kitchen. A fourth officer entered the home shortly thereafter, so that all four officers were present in the home when Pledger consented to the search of her home.

The officers testified that they decided to get a search warrant before Pledger returned home. But, according to one officer, "Pledger arrived and gave consent before we got the search warrant," obviating the need to secure the warrant. The officer who allegedly went to get the warrant, however, is the same officer who had Pledger fill out the consent to search form when she arrived. This officer is also the one who received the informant's tip. Yet, the State did not call this officer to testify. Although the State introduced what appears to be a consent to search form, it was not signed[2] by Pledger. The resulting search of the home revealed an ounce and a half of marijuana, $60, a handgun, and some drug paraphernalia.

In four related enumerations of error, Pledger contends the trial court erred in denying her motion to suppress the evidence seized. Pledger argues the police lacked authority to enter her home, that her consent to search was the product of that illegal entry and the subsequent seizure of her person, and that the evidence seized was tainted by the preceding illegalities. We agree.

The State bears the burden of proving that both the search and seizure of evidence were lawful. OCGA § 17-5-30 (b). To justify a war-

---

[2] It appears that Pledger put her name next to the space at the top of the form which provided "I, *Patches Pledger*, having been informed. . . ." However, contrary to the officer's testimony, her signature does not appear at the bottom of the form beneath the text authorizing the police to search her home.

rantless search on the grounds of consent, the State must prove the consent was voluntary under the totality of the circumstances. *Raulerson v. State*, 268 Ga. 623, 625 (2) (a) (491 SE2d 791) (1997), citing *Schneckloth v. Bustamonte*, 412 U. S. 218, 229 (93 SC 2041, 36 LE2d 854) (1973). Further, if a suspect's consent is given following an illegal detention, the State must also show that the consent was not the product of that illegality. *VonLinsowe v. State*, 213 Ga. App. 619, 622 (2) (445 SE2d 371) (1994); *Brown v. State*, 188 Ga. App. 184, 187 (372 SE2d 514) (1988); *United States v. Robinson*, 625 F2d 1211, 1219 (5th Cir. 1980). This requirement focuses on causation: "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Citation and punctuation omitted.) *Wong Sun v. United States*, 371 U. S. 471, 488 (III) (83 SC 407, 9 LE2d 441) (1963). Whether consent is the product of free will or the preceding illegality must be answered on the facts of each case; no single fact is dispositive. *Brown v. Illinois*, 422 U. S. 590, 603 (95 SC 2254, 45 LE2d 416) (1975). In this case, we find that Pledger's consent was the product of the police officers' exploitation of an illegal entry into her home and an illegal seizure of her person. Consequently, the evidence obtained following the consent search should have been suppressed.

The Fourth Amendment states that people "[shall] be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As this Court has stated:

> "A man's home is his castle. The storm and wind may enter, but the King cannot enter, and all the forces of the Crown cannot cross the threshold of his ruined tenement." These words by Lord Eldon served as the basis for that portion of the Fourth Amendment in the Bill of Rights declaring that the people shall be secure in their houses against unreasonable searches and seizures.

(Footnote omitted.) *Hogan v. State*, 140 Ga. App. 716 (231 SE2d 802) (1976). Fundamentally, there exists a justified expectation of privacy against unreasonable *intrusions* into the home. See id.; *State v. Brown*, 212 Ga. App. 800, 801-804 (2) (442 SE2d 818) (1994). Therefore, an unconsented police *entry* into the home constitutes a search within the meaning of the Fourth Amendment. See 1 LaFave, Search & Seizure 474-480, § 2.3 (b) (3rd ed. 1996).[3] Thus, we must first

---

[3] Once an officer physically enters a home, he is "searching" it in that he is observing it with his senses. This is why evidence discovered in "plain view" (or smell, hearing, or touch) during a warrantless search of a home is generally suppressed if the officer detects the evi-

determine whether the officers were legally entitled to enter Pledger's home under the facts of this case.

A warrantless entry into and search of a residence may be authorized by the consent of any person "who possesses common authority over or other sufficient relationship to the premises to be searched." (Citations omitted.) *Smith v. State,* 264 Ga. 87-88 (2) (441 SE2d 241) (1994). "Common authority" has been defined as the

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 88 (2), citing *United States v. Matlock,* 415 U. S. 164, 171, n. 7 (94 SC 988, 39 LE2d 242) (1974).

There is no evidence in the record establishing Pledger's relationship to the man who let the officers into the residence or the extent of his authority over the residence. There is no evidence that he was a tenant or a resident guest or otherwise a "co-inhabitant" of the premises. We cannot even be sure from this record whether the man was an adult. Although the police speculated the man was a social guest who was left "sort of in charge," there are no facts establishing the man's status or the extent of his authority. Under these circumstances, the police could not reasonably assume the man had Pledger's authority to allow them into her home in her absence. See *Illinois v. Rodriguez,* 497 U. S. 177, 185-186 (110 SC 2793, 111 LE2d 148) (1990). Given the dearth of evidence on this point, we must conclude the State failed to carry its burden of showing the police had lawful consent to be in Pledger's home. See *United States v. Matlock,* supra; *Smith v. State,* supra.

When Pledger returned to her home, she was met by four police officers who had no authority to be inside. Given the circumstances of this case, however, it is very unlikely that Pledger appreciated this

---

dence from a place he is not legally entitled to be. See, e.g., *State v. Peterson,* 273 Ga. 657, 658 (543 SE2d 692) (2001).

> [T]he plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer only if the officer's *access* to the object itself has some prior Fourth Amendment justification. *Horton v. California,* 496 U. S. 128, 137, n. 7 (110 SC 2301, 110 LE2d 112) (1990); *Illinois v. Andreas,* 463 U. S. 765, 771 (103 SC 3319, 77 LE2d 1003) (1983). See also 1 LaFave, Search & Seizure 399, § 2.2 (a) (3rd ed. 1996). The officer gains access justified by the Fourth Amendment by obtaining a warrant, obtaining consent, or by the existence of exigent circumstances which require the officer to act immediately without warrant or consent.

(Emphasis in original.) *State v. David,* 269 Ga. 533, 535-536 (2) (501 SE2d 494) (1998).

and understood that she could ask the officers to leave. That is because the officers' illegal entry was further exacerbated by these factors: It was the middle of the night.[4] Pledger's guests had been handcuffed and detained[5] in her living room by a police officer. Four police officers bearing badges and possibly intimating that a warrant was forthcoming[6] were standing in her small, dimly lit home. This

---

[4] We have some concern about the officers' decision in this instance to approach Pledger's home and to seek her consent to search near midnight. As the Eleventh Circuit Court of Appeals recently noted:

Nighttime searches are deemed to be more intrusive than daytime searches, and the assemblage of law enforcement officers at one's door in the middle of the night has a tendency to be more coercive than during the day. *See United States v. Jerez*, 108 F3d 684, 690-92 (7th Cir. 1997) (Where the officers roused the defendants from their beds in a motel in the middle of the night by knocking on the door for three minutes, shined a flashlight through the window, and requested that they open the door, the defendants were "seized" as a reasonable person in their situation would not have felt free to ignore the deputies and continue about their business.); *Fontenot v. Cormier*, 56 F3d 669, 675 (5th Cir. 1995) (The deputies' conduct in abruptly awakening the defendant in the middle of the night to ask if they could enter the residence and refusal to leave the residence thereafter constituted a "show of authority" that was unreasonable.); *Harless v. Turner*, 456 F2d 1337, 1338-39 (10th Cir. 1972) (per curiam) (No legally effective consent was given after a number of sheriff's deputies invaded the defendant's home in the middle of the night and forced the defendant and his wife out of bed.).

*United States v. Ramirez-Chilel*, 289 F3d 744, 751, n. 8 (11th Cir. 2002).

[5] We find no law authorizing the officers to handcuff and detain Pledger's guests under these circumstances. Both were "seized" within the meaning of the Fourth Amendment because "by means of physical force or a show of authority . . . in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Footnote omitted.) *United States v. Mendenhall*, 446 U. S. 544, 553-554 (II) (A) (100 SC 1870, 64 LE2d 497) (1980); see also *State v. Kwiatkowski*, 238 Ga. App. 390, 392 (519 SE2d 43) (1999). Such a seizure may have been permissible if the officers had a warrant to search the premises because " '[a] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.' *Michigan v. Summers*, 452 U. S. 692, 705 (101 SC 2587, 69 LE2d 340) (1981)." *Gober v. State*, 264 Ga. 226, 227 (2) (a) (443 SE2d 616) (1994); see also OCGA § 17-5-28. Here, however, the officers had no warrant. Further, we cannot sustain the detention under a *"Terry* stop" analysis because the men were not subjected to "the momentary inconvenience" of a brief investigatory detention founded upon reasonable articulable suspicion. See *Randolph v. State*, 246 Ga. App. 141, 146 (3) (b) (538 SE2d 139) (2000). The fact that they were handcuffed and detained for 45 minutes, in fact, strongly suggests an arrest. See *Florida v. Royer*, 460 U. S. 491, 502-503 (103 SC 1319, 75 LE2d 229) (1983); *Montero v. State*, 245 Ga. App. 181 (537 SE2d 429) (2000). Nor can we say that the odor of marijuana alone provided probable cause or even reasonable articulable suspicion that the guests were committing or were about to commit a crime. The officer testified that he could not locate the source of the odor or even determine if it was recent. There was simply no evidentiary context linking the odor of marijuana to the men. The marijuana evidence, standing alone, was insufficient to authorize their handcuffing and detention. See *Patman v. State*, 244 Ga. App. 833, 835 (537 SE2d 118) (2000); see also *Clare v. State*, 135 Ga. App. 281, 283 (2) (217 SE2d 638) (1975) (odor of marijuana, by itself, does not justify the warrantless search of a house). And, of course, in this case, the odor was only discovered after an unauthorized entry.

[6] Although the record reveals nothing concrete on this point, it contains disturbing hints that the officers may have, by words or actions, conveyed to Pledger that she should

scene is one which strongly suggests an "undertaking which is not entirely dependent on the consent and cooperation of the suspect." *United States v. Edmondson*, 791 F2d 1512, 1515 (1) (11th Cir. 1986).

The only remaining issue is whether Pledger's consent was the product of these preceding illegalities — the "fruit of the poisonous tree." See *Wong Sun v. United States*, 371 U. S. at 487-488 (III). This Court has held that

> in order to eliminate any taint from an involuntary seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of the illegal detention. Proof of a voluntary consent alone is not sufficient. The relevant factors include the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct.

(Citations omitted.) *Brown v. State*, 188 Ga. App. at 187; *Brown v. Illinois*, 422 U. S. at 603-604. In this case, Pledger's consent to search was obtained immediately after she was illegally seized by the police. The record reveals no intervening circumstances that would attenuate the causal chain. Finally, the purpose and flagrancy of the police misconduct in this case were significant. The police went to Pledger's home with the specific intention of obtaining consent to search. They went at night, in force, and entered her home when she was not there. They gained entry without proper authorization and unlawfully detained and handcuffed the people inside her home. Consequently, we find Pledger's consent was not purged of the taint of the preceding illegalities. The trial court erred in denying Pledger's motion to suppress.

*Judgment reversed. Smith, P. J., and Eldridge, J., concur.*

DECIDED OCTOBER 9, 2002.

*James C. Wyatt*, for appellant.
*Fred R. Simpson, Acting District Attorney, Charles S. Cox, Assistant District Attorney*, for appellee.

---

consent to a search of her home because a warrant was forthcoming. In fact, the officer's description of the "knock-and-talk" technique seems to imply that consent to search is routinely presented as the only alternative to an immediate seizure followed by a warrant. See footnote 1, supra. "When an officer represents to an accused that a warrant to search will be obtained if consent is refused, and does not have probable cause to secure the warrant, then the accused's consent is invalid." (Citation omitted.) *Darby v. State*, 216 Ga. App. 781, 783 (2) (455 SE2d 850) (1995).