## A03A0618. BROWN v. THE STATE.
(582 SE2d 516)

ADAMS, Judge.

In what he characterized as a "knock-and-talk" appearance, a law enforcement officer obtained Charles Anthony Brown's consent to search his home after entering the home without a warrant. Brown was subsequently convicted of trafficking in cocaine and possession of marijuana with intent to distribute based on evidence obtained during the search. Brown contends that under the circumstances, the consent was not voluntary, and therefore the trial court should have granted his motion to suppress.

On appeal from a motion to suppress, the evidence is viewed in a light most favorable to upholding the trial court's judgment. The credibility of witnesses and the weight accorded their testimony rest with the trier of fact. Thus, the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous.

(Punctuation and footnotes omitted.) *Sanders v. State*, 247 Ga. App. 170 (543 SE2d 452) (2000).

Viewing the facts so as to uphold the trial court's judgment shows that at about 8:30 a.m. on August 31, 2001, an informant told Special Agent Dan Wilcox of the Georgia Bureau of Investigation that Brown had drugs at his home. Later that morning, Wilcox conducted what he referred to as a "knock-and-talk investigation," with a goal of obtaining consent to search. He described it as follows:

When I receive information, I go and follow up through my own independent investigation. And I'll go to that residence, knock on the door, get the person to the door, and tell them what information I have to see if they will, one, consent to search, and he did, in this case.

In this case, Wilcox and two other agents, each armed, drove to Brown's mobile home in an unmarked GBI van, and upon arrival, Wilcox asked John Battle, Jr., who was sitting outside, where Brown was. Battle responded that Brown was inside, and Wilcox knocked on the door. Ulysses Pullen answered the door, and Wilcox asked him the same question. Pullen said that Brown was in the bathroom. Wilcox testified, "I called out to him. He didn't hear me, so I went to the bathroom and knocked on the door. Mr. Brown acknowledged. I told him who I was and that I needed to see him outside." On cross-examination, Wilcox testified, "I ask if Brown is in the house . . . and [Pullen] said yes, he's in the bathroom. . . . I call out for [Brown], no answer, so I step inside and [Pullen] points and shows me which way is the bathroom." At that time, Wilcox did not have, nor had he sought to obtain, a warrant to enter and search the house or to arrest anyone.

Wilcox stepped back outside and then heard Brown call out that he was in the kitchen. Wilcox testified, "So I walked back and greeted him at the kitchen area." He then told Brown about the drug information that he had and explained that he wanted to talk with him about it. Brown responded that he had been "messing with marijuana" but not harder drugs. Brown also mentioned that he had marijuana hidden in the woods.

Shortly thereafter, Brown signed a form authorizing a search of his home. Wilcox made a trip back to the van to get the form and

returned along with Agent Todd Lowery. Wilcox testified that he read the form to Brown in his kitchen at a time when Brown was not under restraint and no weapons were drawn. Lowery witnessed Brown sign the form in the kitchen. The third agent entered the home at about this time. Brown then left with Agent Lowery and drove Lowery on a golf cart to locations on his property where he had stored marijuana. Brown found three large bags of marijuana, and the two men returned to the house. Lowery then searched the area near where Brown found the bags, and he discovered what appeared to be more marijuana and cocaine, together with scales and some pills. After Lowery and Brown returned with the marijuana, Brown was taken to the sheriff's office where he signed a waiver of rights form and gave an oral statement, essentially confessing.

The trial court correctly held that the motion to suppress raised two issues: (1) whether Wilcox had proper consent to enter the home, and (2) whether Brown's consent to search was voluntary. The trial court answered both questions in the affirmative.

1. The law in this area is well established. The State bears the burden of proving that a search and seizure of evidence were lawful. OCGA § 17-5-30 (b). To justify a warrantless search on the grounds of consent, the State must prove the consent was voluntary under the totality of the circumstances. *Raulerson v. State*, 268 Ga. 623, 625 (2) (a) (491 SE2d 791) (1997), citing *Schneckloth v. Bustamonte*, 412 U. S. 218, 229 (93 SC 2041, 36 LE2d 854) (1973). See also *Pledger v. State*, 257 Ga. App. 794, 797 (572 SE2d 348) (2002). In addition, in a case involving a third party's consent to search, "the State has the burden to prove not only that consent was voluntary but that the third party had authority over, and other sufficient relationship to, the premises sought to be inspected. [Cits.]" *Ford v. State*, 214 Ga. App. 284 (1) (447 SE2d 334) (1994). See also *State v. West*, 237 Ga. App. 185 (514 SE2d 257) (1999).[1] The type of authority or relationship to the premises by the third party must constitute the following:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. [Cit.]

*Smith v. State*, 264 Ga. 87, 88 (2) (441 SE2d 241) (1994).

---

[1] The fact that Wilcox may not have been actually searching when he walked in and out of the house is not relevant. "[A]n unconsented police *entry* into the home constitutes a search within the meaning of the Fourth Amendment." (Citation and footnote omitted; emphasis in original.) *Pledger*, 257 Ga. App. at 797.

Resolution of this issue requires determining whether the objective facts available to the officer at the time would warrant a person of reasonable caution to conclude that the third party had authority over the premises. *State v. Stewart*, 203 Ga. App. 829, 830 (418 SE2d 110) (1992). Further, an officer's belief that a third party has sufficient authority should be based on both information previously obtained in the investigation and the facts and circumstances existent at the time of the search. *Browning v. State*, 176 Ga. App. 420, 422 (1) (336 SE2d 41) (1985).

Here, the only information regarding anyone's authority to consent to entry that Wilcox had before knocking on the door was that the home was Brown's residence, not Pullen's. And the only information in the record regarding Pullen's alleged authority to consent to entry was Wilcox's testimony that Pullen "appeared to have been living — by his presence being there," and that Pullen said, "yeah, Dan, he's in the bathroom, and pointed down the hall. . . ." Wilcox made no effort whatsoever to determine if Pullen had authority to consent to search Brown's home. And the mere presence of a third party who opens the door is insufficient to show the type of authority required. See *Pledger v. State*, 257 Ga. App. at 798; *Brown v. State*, 240 Ga. App. 321, 322 (1), n. 1 (523 SE2d 333) (1999); *State v. Floyd*, 161 Ga. App. 49, 50 (289 SE2d 8) (1982). But see *Freeman v. State*, 248 Ga. App. 363, 365 (1) (548 SE2d 616) (2001) (where person answering hotel room door steps aside and allows the police to enter in the presence of only other occupant of room, there is some evidence of consent to enter).

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welchel v. State*, 255 Ga. App. 556, 557-558 (565 SE2d 870) (2002), quoting *Welsh v. Wisconsin*, 466 U. S. 740, 748 (II) (104 SC 2091, 80 LE2d 732) (1984). In this case, there is simply no information in the record to support the conclusion that Pullen had joint access or control of Brown's residence for most purposes. The State did not carry its burden. Accordingly, the trial court's finding that Wilcox's initial entry into Brown's home was authorized by consent was clearly erroneous.

2. We next address whether Brown's subsequent consent to search was tainted by Wilcox's illegal entry into his home. See *Pledger*, 257 Ga. App. at 797. In other words, we must decide whether Brown's consent was the product of the preceding illegalities, i.e., the "fruit of the poisonous tree." See id. at 798. "The relevant factors include the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct." (Citations omitted.) Id. at 800. "Whether consent is the product of free will or the preceding illegality must be

answered on the facts of each case; no single fact is dispositive. *Brown v. Illinois*, 422 U. S. 590, 603 (95 SC 2254, 45 LE2d 416) (1975)." *Pledger*, 257 Ga. App. at 797.

In this case we are very concerned that Wilcox engaged in a course of conduct calculated to intimidate Brown. The facts suggest that Wilcox was willing to enter the house regardless of who opened the door. And the fact that he exited after knocking on the bathroom door strongly suggests that Wilcox knew that he did not have permission to enter in the first place. In addition, Wilcox was unclear on the actual sequence of events, and his testimony was at times inconsistent. Finally, there was virtually no lapse of time between the illegal entry and the subsequent reentry and questioning.

Nevertheless, although the facts are in dispute, there is some evidence that Wilcox exited the home and then reentered at Brown's request. Wilcox testified that after knocking on the bathroom door, he told Brown to meet him outside, and then he went outside to wait. Wilcox testified that moments later, Brown called out that he was in the kitchen. Brown testified, "I comes out the restroom, came into the hallway and say, I'm out the restroom, and I say, here I go, sir. . . . And I came through the hallway. I spoke to Mr. Wilcox as he came back in. We goes to the kitchen. . . ."

The trial court must determine the credibility of the witnesses, and this court must affirm that determination unless it is clearly erroneous. Here, the trial court prepared a lengthy and thorough order supporting its decision. In that decision, the court found that the testimony of the law enforcement officers was the most credible on the key issues of whether Brown had called Wilcox back into the house after the initial entry and on whether Brown gave his consent without any threat or other coercive actions by Wilcox. Even though only a short time elapsed between the illegal entry and the subsequent consent to search, based on the trial court's findings of fact, we hold that the intervening actions sufficiently attenuated the link to the illegal entry and the subsequent consent. Under the circumstances, we cannot conclude that the illegal entry was so flagrant as to overcome the effect of the intervening circumstances. Therefore, we hold that Brown's subsequent consent to search was not so tainted by the illegal entry that the evidence should be excluded.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED MAY 21, 2003 — ■

*Daniel B. Kane*, for appellant.

*Timothy G. Vaughn, District Attorney, Catherine M. Leek, Russell P. Spivey, Assistant District Attorneys,* for appellee.