A07A1779. BRYANT v. THE STATE.
A07A1780. O'NEILL v. THE STATE.
(655 SE2d 707)

PHIPPS, Judge.

An indictment charged Jimmy Bryant, Brian O'Neill, and Jeffrey Horton with violations of the Georgia Controlled Substances Act. All defendants filed motions to suppress. The trial court granted Horton's motion but denied Bryant's and O'Neill's motions. At a bench trial, the court convicted the latter two defendants of the offenses with which they were charged. Bryant appeals in Case No. A07A1779 and contends that the trial court erred in denying his motion to suppress. O'Neill appeals in Case No. A07A1780 and claims that the evidence is insufficient to support his conviction. Finding no merit in either claim of error, we affirm the convictions in both cases.

Evidence presented at the hearing on the motions to suppress showed that on October 17, 2005, Henry County Police Officer Kevin Conner recovered approximately one-half ounce of methamphetamine from the vehicle of a motorist who had been stopped by another officer. The motorist, Mindy Turner, was then interviewed by Henry County Police Department narcotics agents David Lemacks and Matthew Marlow. She told the agents that when stopped she had been en route to a Super 8 motel to meet a very large white male known as Big Jim, who was a motel guest, and to see her friend Justin, who worked at the front desk. Lemacks asked Turner if she thought there would be drugs in the motel room, and she said that "if Big Jim is there there's probably going to be drugs there."

Lemacks and Marlow, dressed in plain clothes, then went to the motel accompanied by uniformed Conner. Lemacks went to the front desk, identified himself to the night manager, and asked about Justin. The night manager informed Lemacks that he had been having problems with Justin. Specifically, he suspected that Justin had been renting rooms without registering the guests and then pocketing the rental money. After Lemacks obtained the night manager's consent to view the motel registry, he saw that the day before Justin had rented two rooms to persons named Horton and Tanner, but only the room rented by Horton remained occupied. Both motel

guests were area residents who had paid for their rooms with cash. Lemack's suspicions were aroused because, based on his experience, drug dealers ply their trade from motel rooms located in areas where they reside and for which they pay cash. Lemacks, therefore, asked the night manager if he could go to the room that was still occupied to try to find Big Jim, and the manager said yes. Lemacks, Marlow, and Conner then went to the room. Lemacks knocked on the door. A heavyset man later identified as Bryant opened the door. Lemacks displayed his police badge and asked Bryant if he was Big Jim. Bryant said that he was.

According to the officers, the following events then transpired. Lemacks asked Bryant if he could come into the motel room to talk to him, and Bryant said that he could. Marlow, with badge in hand, and Conner also entered the room. O'Neill and Horton were lying on the bed. O'Neill was unconscious. Upon entering the room, Marlow saw a knife on the television stand and another knife close to O'Neill's hands, and he advised the other officers of his discovery. Out of concern for officer safety, O'Neill and Horton were asked to stand. O'Neill, however, could not be awoken. When Horton stood, the officers saw on the bed near O'Neill a ring box and two glass pipes of a type commonly used to smoke methamphetamine. Bryant and Horton then consented to being patted down for weapons, and Horton additionally consented to a search of the room. During the patdown of Horton, Conner felt an object in Horton's pocket that, according to Conner, was immediately identifiable as contraband. Conner thereupon removed from Horton's pocket a plastic bag containing suspected methamphetamine. Marlow testified that Bryant acknowledged to him that a black lock box on a night stand was his and that there was "some dope and some other stuff" inside the box. According to Marlow, Bryant gave him a key to the box and permission to open it.

The officers' testimony was contradicted by Bryant and Horton. They testified that when the officers appeared at the motel room door and asked to speak to Bryant, he attempted to step outside the room, but the officers blocked his exit and insisted upon entering the room and talking to him there. Bryant also denied that he had admitted that there was contraband in the lock box, that he had given consent to search the box, or that knives were visible in the room.

In any event, more than 28 grams of methamphetamine and less than one gram of methylenedioxymethamphetamine were found inside the lock box. Tablets that tested positive for alprazolam were found in another box in the room. And a set of knives was found in yet another box. Approximately 2.86 grams of methamphetamine were found inside the ring box. Although no drugs were found on O'Neill's

person, he was charged with unlawful possession of the methamphetamine in the ring box because it was found beside him and because the officers had learned from Bryant or Horton that O'Neill had passed out from drinking or smoking.

In its order on the motions to suppress, the trial court reasoned that because the officers knew that Horton had rented the motel room into which they entered, because Bryant and O'Neill were transient visitors, because the officers should have known when Bryant answered the door that he was not Horton, and because they entered the room without making any inquiry concerning his authority over the premises, their entry into the room violated Horton's but not Bryant's or O'Neill's constitutional rights.[1] The court further found that Bryant consented to the officers' entry into the room, that the officers' observation of the glass pipes provided at least an articulable suspicion of criminal activity justifying their investigatory detention of Bryant and O'Neill, that Bryant voluntarily consented to the search of the lock box, and that the officers' discovery of the methamphetamine in the lock box provided probable cause for Bryant's arrest and for their search of other containers in the room incident to his arrest. Accordingly, the trial court denied Bryant's and O'Neill's motions to suppress and granted Horton's motion.

At the bench trial, Bryant and O'Neill stipulated to the evidence presented at the hearing on their motions to suppress and to the results of the state crime lab's analysis of the seized evidence. Bryant was convicted of trafficking in methamphetamine, unlawful possession of methylenedioxymethamphetamine, and unlawful possession of alprazolam. O'Neill was convicted of unlawful possession of methamphetamine.

1. Challenging the trial court's denial of his motion to suppress, Bryant argues that because Turner's reliability was unknown, the information she provided lacked sufficient detail to establish any sort of reasonable suspicion that he was engaged in criminal activity. Bryant also argues that he was seized by the officers when they

---

[1] See *Brown v. State*, 261 Ga. App. 351, 354 (1) (582 SE2d 516) (2003) (mere presence of third party who opens door to residence insufficient to show that such person has authority to consent to entry into residence); but see *Freeman v. State*, 248 Ga. App. 363, 365 (1) (548 SE2d 616) (2001) (person answering hotel room door in presence of only other occupant of room has authority to allow police to enter); see generally *Floyd v. State*, 237 Ga. App. 586 (516 SE2d 96) (1999) (person who had not rented motel room but was just a transient visitor did not have reasonable expectation of privacy in the premises and therefore lacked standing to object to search of room).

prevented him from stepping outside of the motel room and that any consent he gave to the opening of the lock box was the product of that illegal detention.[2]

> When ruling on [a motion to suppress], the trial court sits as the trier of facts, and its findings regarding them are not disturbed on appeal if there is any evidence to support them; the trial court's decisions with regard to questions of fact and credibility must be accepted unless clearly erroneous, and a reviewing court construes the evidence most favorably to the trial court's findings.[3]

(a) To support his argument that the officers' initial investigation was not based upon any reasonable suspicion of criminal activity, Bryant relies on cases such as *Rucker v. State*.[4] *Rucker* held that because the police officer there received information from a tipster whose reliability was unknown, and because the information was not sufficiently detailed to predict future behavior that otherwise would not be easily predicted, the information was insufficient to support the officer's investigatory stop of the defendant's vehicle. A police officer's investigatory stop of a vehicle is classified as a second-tier police-citizen encounter.

> Decisions of the U. S. Supreme Court have delineated three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.[5]

Unlike a second-tier encounter, however, a first-tier encounter provides no Fourth Amendment protection.[6] "In a first-tier encounter, police may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity[,]"[7] so long as "a reasonable person would feel free to decline the officers' request or otherwise

---

[2] See generally *State v. Cooper*, 260 Ga. App. 333, 334 (1) (579 SE2d 754) (2003) (even if a person lacks standing to challenge police officers' entry onto premises, he still has standing to challenge his own detention).

[3] *Brown v. State*, 278 Ga. 724, 726-727 (2) (609 SE2d 312) (2004) (citation omitted).

[4] 276 Ga. App. 683 (624 SE2d 259) (2005).

[5] *Chapman v. State*, 279 Ga. App. 200, 201 (1) (630 SE2d 810) (2006) (citation omitted).

[6] *State v. Cauley*, 282 Ga. App. 191, 196 (2) (638 SE2d 351) (2006).

[7] Id. (punctuation and footnote omitted).

terminate the encounter."[8] "A request to search during a first-tier encounter does not require articulable suspicion."[9]

Although a mere knock by the police on someone's door and request to enter the premises usually constitute a first-tier encounter, a second-tier encounter occurs if under the totality of the circumstances a reasonable person would have felt compelled to open the door and let the police enter.[10] Here, the evidence, construed most favorably to the trial court's decision, authorized the court to find that the officers' knock on the motel room door and request to enter constituted a first-tier encounter that need not be supported by any degree of cause or suspicion.

(b) The evidence, again construed most favorably to the lower court's decision, also authorized the court to find that the state carried its burden of proving that Bryant voluntarily consented to the officers' entry into the motel room and, thus, was not seized by them.[11]

2. Challenging the sufficiency of the evidence to support his conviction, O'Neill argues that the state failed to meet its burden of proving that he was in possession of the methamphetamine in the ring box.

When the defendant in a criminal case challenges the sufficiency of the evidence on appeal, "the evidence must be viewed in the light most favorable to support the verdict, and appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility."[12] "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[13]

The evidence here showed that after Bryant opened the door and let the officers into the motel room, they observed O'Neill and Horton on the bed. Horton was conscious and alert. O'Neill had passed out. Between two and three grams of methamphetamine, and a device

---

[8] *United States v. Jerez*, 108 F3d 684, 689 (7th Cir. 1997) (citations and punctuation omitted).

[9] *Cauley*, supra (footnote omitted).

[10] See *Pledger v. State*, 257 Ga. App. 794, 799, n. 4 (572 SE2d 348) (2002), citing *Jerez*, supra.

[11] See *State v. Benjamin*, 266 Ga. App. 205, 207 (2) (596 SE2d 623) (2004) (one of the specifically established exceptions to the warrant and probable cause requirements is a search that is conducted pursuant to consent); see also *Daniel v. State*, 277 Ga. 840, 846 (3) (597 SE2d 116) (2004) (government bears burden of proving voluntariness of consent).

[12] *Fuller v. State*, 256 Ga. App. 840, 842 (2) (570 SE2d 43) (2002) (citation and punctuation omitted).

[13] *Davis v. State*, 270 Ga. App. 777 (1) (607 SE2d 924) (2004) (citation and punctuation omitted).

used to smoke methamphetamine, were found on the bed. According to Lemacks, either Bryant or Horton attributed O'Neill's unconscious state to the fact that he was having marital problems and had been drinking or smoking the entire night. These circumstances were sufficient to "authorize a finding that [all three occupants of the rooms] had equal access to the [methamphetamine in the ring box] and were in joint possession of [it]."[14]

*Judgments affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED DECEMBER 13, 2007 —

*Diana L. Davis*, for appellants.
*Tommy K. Floyd, District Attorney, David E. Slemons, Assistant District Attorney*, for appellee.

---

[14] Id. at 779 (1) (citation omitted); compare *Turner v. State*, 276 Ga. App. 381 (623 SE2d 216) (2005) (defendant's conviction of possession of cocaine reversed based on insufficiency of evidence, where sole evidence of cocaine possession was defendant's ownership and driving of vehicle in which cocaine was found under passenger seat, and passenger had equal access to the cocaine and was not charged with possession of cocaine).