A09A2155. HUNT v. THE STATE.

(691 SE2d 368)

SMITH, Presiding Judge.

Karnell Hunt appeals from his convictions for trafficking in cocaine, possession of cocaine with intent to distribute, and possession of 3, 4-methylenedioxymethamphetamine with intent to distribute. Hunt contends the trial court erred by denying his motion to suppress and by allowing the State to call his wife to the witness stand after she voiced an intent to invoke her marital privilege. Because the trial court erred by denying Hunt's motion to suppress, we reverse.

1. Hunt contends the trial court should have granted his motion to suppress because the police searched his home based upon the

unauthorized consent of a visitor who did not live in the home. When

> reviewing a trial court's ruling on a motion to suppress, evidence is construed most favorably to uphold the findings and judgment. The court's findings of fact will not be disturbed if there is any evidence to support them. We consider evidence from both the motion to suppress hearing and the trial.

(Citations, punctuation and footnotes omitted.) *Hicks v. State*, 287 Ga. App. 105 (650 SE2d 767) (2007).

So viewed, the record shows that eight to ten police officers went to a house at 3340 Clevemont Way in response to an anonymous telephone call concerning narcotics at that location. The officers did not conduct any surveillance before going to the address; instead, they went straight to it after receiving the anonymous phone call.

Officer Harris testified that he and Officer Tyson knocked on the front door for several minutes in a nonaggressive manner. They heard movement in the house and a dog barking in the garage before Deletheo Hutchinson opened the front door. Hutchinson "appeared extremely nervous" and explained that it took him a long time to come to the door because he was putting the dog in the garage. Officer Harris testified in the preliminary hearing,

> At that time we explained why we were there and asked him if we could speak to him about the complaint, and at that time he opened the door and let us come in. When we — when we walked into the front living room, we observed a handgun right by, within arm's reach of Mr. Hutchinson right by the front door. That was the first thing we noticed when we walked into the room. Based on that, we detained him in the living room and did a real tertiary walk-through of the area where he, where we would be in danger ourselves just from standing there talking to him. When we did so, I observed several partially smoked marijuana cigarettes on the, on the coffee table in the living room as well as the kitchen counter; and when I walked into the kitchen, I observed a hard plastic container that had been cut open. I immediately recognized it as cocaine packaging commonly used to package kilos of cocaine. It was cut open and there was cocaine residue covering the inside of that . . . that hard plastic container. Based on that, we called narcotics to the scene.

Officer Harris also testified that

> as we stood there and spoke with him and explained the complaint and asked him if we could come in, he agreed. When we ask — when we continued to explain the narcotics complaint, he stated that this was not his house, that anything in the house did not belong to him, and he had no idea about any drugs or drug activity at the house.

During cross-examination, Officer Harris testified that Hutchinson told them he did not live there *before* giving them permission to enter.

Officer Harris testified that based upon how the front door swung open and the location of the living room within the house, the gun and marijuana would not have been visible while the officers were standing outside the house, even if the door had been open. According to Officer Harris, the gun would not have been visible until they were "two or three feet inside the doorway." Pictures of the inside entrance of the home corroborate Officer Harris's testimony that the officers would have had to be several steps inside the home in order to see the gun. The door opened inward toward the railing and blocked the view of the television that was located in a lower level of the home from the entrance area. According to Officer Harris, Officer Tyson could not have seen the marijuana cigarettes on the living room coffee table until after he had already secured the gun and placed Hutchinson on the living room couch.

Officer Tyson, the only other officer who knocked on the door, testified at trial that after Hutchinson allowed him into the home, he saw the gun when he was in an area he described as being "in the doorway," which was not outside the house, but on the interior stairwell of the house's entrance area. He then immediately detained Hutchinson for safety reasons, and the officers began clearing the house of any other persons for safety reasons as well. Officer Tyson also claimed that he saw marijuana cigarettes while he was standing in the same location that he saw the gun.[1]

While securing the home after their entry, the police observed, in plain view, other illegal contraband in the home. Based upon these observations, they obtained a search warrant, and their subsequent detailed search revealed more contraband. While the police were inside his home, Hunt called and spoke to a narcotics detective. The

---

[1] To the extent the State contends that Officer Tyson saw the gun when the door opened and while he was standing outside the home, we find that this claim is not supported by the record. The only fair reading of the record is that Officer Tyson saw the gun and marijuana *after* he had crossed the threshold into the home.

detective asked Hunt to return home so that his young children, who were present in the home with their mother, would not be placed in DFACS custody. When Hunt arrived home ten or fifteen minutes later, he came into the house "taking full responsibility for all the drugs that were in the house" and stated that Hutchinson and the mother of his children had nothing to do with it. He then immediately gave the police a written statement consistent with his oral confession.

In its order denying Hunt's motion to suppress, the trial court concluded that "[e]ven if the person who answered the door had no authority to allow the officers to search the entire residence (a fact which has not been proven), he certainly had the apparent authority to open the door and allow the police officers to enter."

On appeal, Hunt contends that the State bears the burden of proving that Hutchinson was authorized to consent to the police officers' entry into Hunt's home and that the State failed to fulfill its burden in this case. We agree.

> The Fourth Amendment states that people "shall be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." . . . Fundamentally, there exists a justified expectation of privacy against unreasonable *intrusions* into the home. Therefore, an unconsented police *entry* into the home constitutes a search within the meaning of the Fourth Amendment.

(Citations, punctuation and footnote omitted.) *Pledger v. State*, 257 Ga. App. 794, 797 (572 SE2d 348) (2002). And, as we have previously stated, "Once an officer physically enters a home, he is 'searching' it in that he is observing it with his senses." (Citation omitted.) Id. at 798, n. 3.

We must therefore determine whether Officers Harris and Tyson were legally entitled to enter the home based upon Hutchinson's consent.

> In a case such as this involving a third party's consent to search, the State has the burden to prove not only that consent was voluntary but that the third party had authority over, and other sufficient relationship to, the premises sought to be inspected. . . . To resolve the issue of third party consent, we must determine whether the objective facts available to the officer at the time would warrant a person of reasonable caution to conclude that the third party had authority over the premises. The officer's belief that the third party has authority over another person's

> property to consent to the search thereof should be based on information previously obtained in his investigation as well as facts and circumstances existent at the time of the search. . . .

(Citations, punctuation and footnote omitted.) *State v. Gray*, 285 Ga. App. 124, 126-127 (1) (645 SE2d 598) (2007).

In this case, it is undisputed that the officers did not know who owned the home or resided there before knocking on the door and had made no effort to make such a determination before embarking on their knock and talk. After arriving at the residence, it is undisputed that they made no effort to determine whether Hutchinson had authority to give consent before asking if they could enter. Indeed, the record shows that they may have known *before* entering the home that Hutchinson did not have sufficient authority.

Based upon the particular facts of this case, the State failed to meet its burden of proving that "a person of reasonable caution" would have concluded that Hutchinson had authority over the premises. *Gray*, supra, 285 Ga. App. at 127 (affirming grant of motion to suppress when officers asked no questions of person who opened automatic gate on property owned by another); *State v. Goodman*, 290 Ga. App. 196, 198 (660 SE2d 21) (2008) (affirming grant of motion to suppress because nothing in record indicated that owner consented to police entry into his home or that person consenting was authorized to allow such entry); *Pledger*, supra, 257 Ga. App. at 798-799 (reversing denial of suppression motion because no showing that unidentified man who opened door had authority to consent to police entry). "[T]he mere presence of a third party who opens the door is insufficient to show the type of authority required. [Cits.]" *Brown v. State*, 261 Ga. App. 351, 354 (1) (582 SE2d 516) (2003). The trial court therefore erred in concluding that Hutchinson had apparent authority to consent to the officers' entry.

Having found that the officers' entry violated the Fourth Amendment, we must now consider whether the evidence obtained by the police was the product of this preceding illegality. "The relevant factors include the temporal proximity of an illegal search and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct." (Citations and punctuation omitted.) *Pledger*, supra, 257 Ga. App. at 800.

In this case, it is clear that the search warrant was obtained from observations made during the officers' illegal entry into Hunt's home and that Hunt's confessions resulted from the officers' presence in his home. Because the police obtained all of their evidence against Hunt during a short period of time after their illegal entry and there were no intervening circumstances that attenuated the causal chain,

we conclude that all of the evidence obtained by the police was "fruit of the poisonous tree" that should have been suppressed by the trial court. *Pledger*, supra, 257 Ga. App. at 800.

2. Our holding in Division 1 renders Hunt's remaining enumeration of error moot.

*Judgment reversed. Phipps and Bernes, JJ., concur.*

DECIDED MARCH 2, 2010.

*Stephen T. Maples*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Daniel J. Quinn, Assistant District Attorney*, for appellee.