**SECOND DIVISION**
**DOYLE, C. J.,**
**MILLER, P. J, and REESE, J.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 8, 2017**

# In the Court of Appeals of Georgia

A17A0148. STATE v. HOLTZCLAW.                    DO-005 C

DOYLE, Chief Judge.

The State appeals from the grant of Audrey Holtzclaw's motion to suppress evidence police found in her house, which evidence is the basis for charges that she crossed the guard line of the county jail with a controlled substance[1] and that she possessed methamphetamine (two counts) and alprazolam in violation of the Georgia Controlled Substances Act.[2] The State contends that the trial court erred by ruling that (1) an occupant of the home lacked authority to allow police into Holtzclaw's home, and (2) Holtzclaw did not thereafter voluntarily give police consent to search her house. For the reasons that follow, we affirm.

---

[1] OCGA § 42-4-13 (d) (1) (A).

[2] OCGA § 16-13-30 (a).

There are three principles that guide our review of a trial court's ruling on a motion to suppress.

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[3]

Further, "to the extent that the controlling facts are undisputed because they are plainly discernable from [a] recording . . . , we review those facts de novo."[4]

So viewed, the record shows that police received a complaint of drug activity at a particular address in Dawson County. Two officers arrived at the residence and knocked on the front door. They could hear activity inside, but initially no one came to the door; soon thereafter, a man named Shannon emerged from a garage door where the officers met him. The officers had independent knowledge that they were

---

[3] (Punctuation omitted.) *Brown v. State*, 293 Ga. 787, 803 (3) (b) (2) (750 SE2d 148) (2013), quoting *Miller v. State*, 288 Ga. 286, 286-287 (702 SE2d 888) (2010).

[4] (Punctuation omitted.) *State v. Depol*, 336 Ga. App. 191, 191 (784 SE2d 51) (2016), quoting *State v. Mosley*, 321 Ga. App. 236 (739 SE2d 106) (2013).

looking for Holtzclaw, who lived at the residence. Shannon explained that "this is not my house. This is my cousin's house . . . I don't live here." Shannon said he had come to visit Holtzclaw, but she was not there. The front door would not open, so he had found another door unlocked and had entered the house to wait for Holtzclaw. Shannon explained that he did not have a key to the house, but Holtzclaw would be back soon. The officers asked Shannon if they could walk through the house to see if anyone else was there, and Shannon said "that's fine with me, but like I said, this is not my house."

After entering the house, police encountered a man named Kevin, who provided a false name and date of birth. Police started to arrest Kevin, but he resisted, and an altercation ensued. After Kevin was subdued, the officers checked the rest of the house and noticed an odor of marijuana and a marijuana smoking device in a separate bedroom. After the initial sweep of the house, Shannon "insisted [on] trying to contact" Holtzclaw, but officers were unable to reach her, so they decided to apply for a warrant to search the house.

Thereafter, investigators arrived, and two officers left the scene to apply for the warrant; on their way, they were advised that Holtzclaw had arrived at her residence, so they went back to speak to Holtzclaw.

When Holtzclaw arrived, she observed that "officers [were] coming in and out of the front door of my house. They were already in there[,] and they had already [taken] Kevin to jail[,] and Shannon was not there. . . . [Police] were in there and didn't have permission to be in my house. . . Nobody was there. Just the police officers with the front door wide open."

Much of the ensuing conversation with Holtzclaw was recorded on an audio recorder triggered by police when they began speaking to her. In that conversation, police asked for consent to search her house, repeatedly assuring Holtzclaw that she would have an opportunity to explain the circumstances for anything they found and whether it was brought there by visitors. The officer also explained to Holtzclaw that they had already found "a marijuana pipe" in the house, and they were in the process of obtaining a search warrant: "Either way, we're gonna find it, so, search warrant or not, so, if you think the search warrant's gonna lessen the blow, I mean, it's not."

Holtzclaw declined consent to search her house, but allowed officers to search her purse and car. Police found a syringe and her mother's prescription pills in Holtzclaw's car, but nothing in her purse. A few minutes later, after further discussion, the officer again asked for consent to search her house, and Holtzclaw said she did not "want to go to jail for something someone else did," pointing out that

4

other people had stayed in her house the prior night. The officer again reiterated that he would allow Holtzclaw a chance to explain whatever they find. Ultimately, Holtzclaw consented to a search of her house.

During the search, police found syringes in Holtzclaw's bedroom and methamphetamine in a jewelry box on her dresser. Holtzclaw was arrested and taken to jail, where an additional packet of suspected methamphetamine was found on her person. Holtzclaw was charged with crossing the guard line of the county jail with a controlled substance and possessing methamphetamine and alprazolam.

Holtzclaw moved to suppress the evidence found in her house, arguing that the police lacked authority to enter it initially and that her subsequent consent was not voluntarily given. Following an evidentiary hearing, the trial court granted the motion, ruling that Shannon did not have authority to allow police into Holtzclaw's home while she was not there and that her subsequent consent based in part on that initial entry was involuntary. The State now appeals.

1. The State contends that the trial court erred by ruling that the police lacked a reasonable, good faith belief that Shannon had authority to let them into Holtzclaw's house. We disagree.

5

The Fourth Amendment states that people "shall be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." Fundamentally, there exists a justified expectation of privacy against unreasonable intrusions into the home. . . [A] police entry into the home constitutes a search within the meaning of the Fourth Amendment. Once an officer physically enters a home, he is "searching" it in that he is observing it with his senses.[5]

Thus, we must first determine whether police had authority to enter and thereby search Holtzclaw's home during their initial entry based on Shannon's consent.

Police conceded that they did not act pursuant to any exigency, and the only basis for their initial entry was Shannon's consent.[6]

In a case such as this involving a third party's consent to search, the State has the burden to prove not only that consent was voluntary but that the third party had authority over, and other sufficient relationship to, the premises sought to be inspected. To resolve the issue of third party consent, we must determine whether the objective facts available to the officer at the time would warrant a person of reasonable caution to conclude that the third party had authority over the premises. The

---

[5] (Citations, punctuation, and emphasis omitted.) *Hunt v. State*, 302 Ga. App. 578, 581 (1) (691 SE2d 368) (2010).

[6] At the suppression hearing, the officer who spoke with Shannon explained that they had no basis for entering Holtzclaw's house other than Shannon's consent: "Had he refused . . . at that time we would have had to leave the house. We would have had no further action to take at that time."

6

officer's belief that the third party has authority over another person's property to consent to the search thereof should be based on information previously obtained in his investigation as well as facts and circumstances existent at the time of the search.[7]

The type of authority or relationship to the premises by the third party must constitute the following: mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[8]

Here, it is undisputed that the police knew that Holtzclaw owned the home, and Shannon explained to them that "this is not my house." Shannon told the officers that he did not have a key, and he was waiting for the owner, who would be there soon.

---

[7] (Punctuation omitted.) Id. at 581-582 (1).

[8] (Punctuation omitted.) *Brown v. State*, 261 Ga. App. 351, 353 (1) (582 SE2d 516) (2003), quoting *Smith v. State*, 264 Ga. 87, 88 (441 SE2d 241) (1994). See also *Georgia v. Randolph*, 547 U. S. 103, 110 (II) (A) (126 SCt 1515; 164 LE2d 208) (2006) ("The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."), quoting *U.S. v. Matlock*, 415 U. S. 164, 171 n. 7 (94 SCt 988, 39 LE2d 242) (1974).

Based on this evidence, the trial court was authorized to find that it was clear from the circumstances that Shannon was merely a visitor to the home and had no actual or apparent authority over it.[9] "[T]he mere presence of a third party who opens the door is insufficient to show the type of authority required" to consent to a search in the absence of the homeowner.[10] Accordingly, this enumeration presents no basis for reversal.

2. The State also argues that the trial court erred by finding that Holtzclaw's subsequent consent to search her house was involuntary. Again, the record supports the trial court's ruling on this issue.

> A search based on voluntary consent eliminates the need for a search warrant or probable cause. The law does not require that a party be told of his right to refuse a search or terminate a search. While giving such information may be considered, voluntariness is determined by the totality of the circumstances, including such factors as the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the

---

[9] See *Brown*, 261 Ga. App. at 354.

[10] Id.

psychological impact of all these factors on the accused. No single factor controls.[11]

Here, the record shows that Holtzclaw arrived at her residence to see police "coming in and out of the front door of my house. They were already in there" before she was asked for consent to search her home.[12] Although no overt threats were made by police, she was told that police already had found a marijuana pipe in her house, and "[e]ither way, we're gonna find it, so, search warrant or not, so, if you think the search warrant's gonna lessen the blow, I mean, it's not." Further, Holtzclaw was prohibited from going into her house until police were able to search her house with a warrant. These circumstances authorized the trial court to conclude that Holtzclaw believed she had very little choice in the matter, particularly because she witnessed police already in her house. Police were able to leverage their discovery of the marijuana pipe during the earlier unauthorized search to convince Holtzclaw to consent to the search. Under these circumstances, the record supports the trial court's

---

[11] (Citations and punctuation omitted.) *Martinez v. State*, 239 Ga. App. 662, 663 (522 SE2d 53) (1999).

[12] The trial court expressly found that this was a factor in its decision: "The Court cannot ignore the Defendant's testimony that they were already in her house when she arrived home."

9

ruling Holtzclaw's consent was the product of the earlier illegal search and therefore not voluntary.[13]

*Judgment affirmed. Miller, P. J., and Reese, J., concur*.

---

[13] See *Pledger v. State*, 257 Ga. App. 794, 797-800 (572 SE2d 348) (2002). See also *Snider v. State*, 292 Ga. App. 180, 183-184 (663 SE2d 805) (2008) (holding that consent was not voluntary based on initial unlawful police action); *Hogan v. State*, 140 Ga. App. 716 (231 SE2d 802) (1976) ("'A [woman's] home is [her] castle. The storm and wind may enter, but the King cannot enter, and all the forces of the Crown cannot cross the threshold of his ruined tenement.' These words by Lord Eldon served as the basis for that portion of the Fourth Amendment in the Bill of Rights declaring that the people shall be secure in their houses against unreasonable searches and seizures.").